IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

TALMADGE L. LOGGINS                                                                    PLAINTIFF

vs.                                          CIVIL NO.05-1044

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                                           DEFENDANT

**MEMORANDUM OPINION**

Talmadge Loggins (hereinafter "plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying his applications for disability insurance benefits ("DIB"), and supplemental security income benefits ("SSI"), under Titles II and XVI of the Act.

**Background:**

The applications for DIB and SSI now before this court were filed on November 28, 2000, alleging disability beginning August 1, 2000, due to depression and paranoia.[1] (Tr. 232-234, 277). An administrative hearing was held on December 3, 2002. (Tr. 384-421). On April 22, 2003, the Administrative Law Judge ("ALJ"), issued an unfavorable decision. (Tr. 198-208). On appeal to the Appeals Council, the case was remanded to the ALJ. (Tr. 209-211). A supplemental administrative hearing was then held on June 15, 2004. (Tr. 422-459). Plaintiff was present and represented by counsel.

---

[1]Plaintiff filed previous applications for benefits on June 2, 1993. These applications were denied following an administrative hearing on November 10, 1995. (Tr. 171). Plaintiff then filed a subsequent application for SSI benefits on January 29, 1997. (Tr. 60-62). This application was also denied at the hearing level on July 11, 1998. (Tr. 187).

At the time of the first administrative hearing, plaintiff was forty-six years old and possessed a high school education with three years of college level training. (Tr. 19, 388). He has past relevant work ("PRW") experience as a dump-truck driver and a nursery laborer. (Tr. 19, 269-274).

On September 22, 2004, the ALJ issued a written decision finding that plaintiff's condition was severe, but did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 28). After discrediting plaintiff's subjective allegations, the ALJ concluded that he maintained the residual functional capacity ( "RFC") to perform medium level work involving simple unskilled to semi-skilled tasks; requiring him to understand, remember, and carry out no more than concrete instructions; and, requiring no more than superficial contact with supervisors and co-workers. Further, the ALJ found that plaintiff could perform work requiring him to meet and greet others, make change, and give simple instructions and/or directions. (Tr. 28). With the assistance of a vocational expert, the ALJ then concluded that plaintiff could return to his PRW as a dump-truck driver. (Tr. 29).

On March 18, 2005, the Appeals Council declined to review this decision. (Tr. 9-11). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 15, 16).

**Discussion:**

The issue before this court is whether the Commissioner's decision is supported by substantial record evidence. "We will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."

*Id. See also Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000). "However, our review 'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision.' Nevertheless, as long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir.1995), or 'because we would have decided the case differently.'" *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001)(citations omitted).

A five-part analysis is utilized in social security disability cases. *See e.g., Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). Applying this analysis, the ALJ must determine, sequentially, the following: 1) whether the claimant is employed; 2) whether the claimant has a severe impairment; 3) whether the impairment meets a listed impairment; 4) whether the impairment prevents the claimant from doing past work; and 5) whether the impairment prevents the claimant from doing any other work. *Id.*; *see also* 20 C.F.R. § 404.1520.

If the claimant fails at any step, the ALJ need not continue. "The claimant carries the burden of establishing that [he] is unable to perform [his] past relevant work, i.e., through step four, at which time the burden shifts to the Commissioner to establish that [he] maintains the residual functional capacity to perform a significant number of jobs within the national economy." *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001)(citing *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000)).

**Discussion:**

Of particular concern to the undersigned is the fact that the record does not contain a mental RFC assessment prepared by plaintiff's treating physician. RFC is the most a person can do despite

3

that person's limitations. 20 C.F.R. § 404.1545(a)(1). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

In the present case, the only mental RFC assessment contained in the record is dated March 1, 2001, and was prepared by a non-examining, consultative psychologist. (Tr. 322-339). *See Vaughn v. Heckler*, 741 F.2d 177, 179 (8th Cir. 1984) (If a treating physician has not issued an opinion which can be adequately related to the disability standard, the ALJ is obligated to address a precise inquiry to the physician so as to clarify the record). We note, that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally constitute substantial evidence. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999).

The relevant medical evidence is as follows. On October 30, 2000, plaintiff underwent an intake screening with Rodney Goodwin, a counselor, and Dr. David Margolis, a psychologist. (Tr. 310-311). Plaintiff reported a history of depression, alcohol dependence, and cocaine dependence. He indicated that he had been diagnosed with major depression with psychotic features and had previously responded well to a low dosage of Haldol. At the time of his appointment, plaintiff

4

complained of hallucinations, problems sleeping, and family problems. He reported seeing "ghosts, kind of fuzzy shadows," and hearing things while in bed. Mr. Goodwin noted that plaintiff scored within the severe category on both the depression and anxiety screeners. (Tr. 310).

As the session wore on, Mr. Goodwin noted that plaintiff became visibly anxious. (Tr. 310). He began shaking his knees and moving around. Plaintiff pointed the shaking out to the examiner and became agitated when the examiner offered suggestions on how to improve his condition. (Tr. 310-311). Mr. Goodwin diagnosed plaintiff with major depression with psychotic features, mood incongruent; rule out substance abuse; rule out malingering; and, rule out antisocial personality traits. (Tr. 311). He then noted that plaintiff global assessment of functioning score ("GAF") was twenty-five. (Tr. 311).

On November 6, 2000, plaintiff had his first appointment with Dr. D. B. Fraser. (Tr. 309). The doctor noted plaintiff's history of psychiatric hospitalization in 1994, as well as his prior diagnosis of major depression with psychotic symptoms. Records indicate that plaintiff's chief complaints were hallucinations and aggressive feelings toward himself and others. Although he did not note a great deal of depressive affect, Dr. Fraser continued plaintiff's diagnosis of major depression with psychotic features. He then prescribed Risperdal. (Tr. 309).

On December 12, 2000, Mr. Goodwin indicated that plaintiff had scored within the "severe" range on the Beck Depression Inventory. (Tr. 308). Further, a vulnerability to stress screener revealed that plaintiff was very vulnerable. (Tr. 308).

This same date, plaintiff told Dr. Fraser that he was out of medication. (Tr. 309). He also complained that the medication was not helping, as he continued to experience auditory

5

hallucinations. Dr. Fraser noted some mild to moderate anxiety, but no other impairment. Plaintiff's mood was more stable than it had previously been, although plaintiff continued to report depressive thoughts and feelings. Accordingly, Dr. Fraser discontinued the Risperdal. (Tr. 309).

On January 3, 2001, plaintiff indicated that he continued to hear voices and experience problems with sleeping, anxiety, and depression. (Tr. 304). Dr. Fraser noted that plaintiff's affect still did not reflect these symptoms and, therefore, malingering was a possibility. Further, the doctor reported that plaintiff had taken both Zyprexa and Risperdal without success. Accordingly, Dr. Fraser prescribed Etrafon. (Tr. 304).

This same date, Mr. Goodwin reported that plaintiff's depressive symptoms were still in the severe range, but had dropped a few points. (Tr. 307). He also noted that plaintiff was interested in participating in group anger management sessions. (Tr. 307).

On February 5, 2001, plaintiff continued to complain of visual and auditory hallucinations. (Tr. 304). Dr. Fraser noted some mild anxiety with an appropriate affect. Records indicate that plaintiff had been non-responsive to Risperdal, Triavil, and Zyprexa. Therefore, Dr. Fraser opted to try plaintiff on a combination of Zyprexa and Prozac. (Tr. 304).

This same date, plaintiff had a counseling appointment with Mr. Goodwin. (Tr. 306-307). He reported experiencing continued nightmares, and was advised to stay in his dreams and face his fears. Plaintiff also stated that he was not able to get along with anyone and was angry. Further, after thirty minutes of his session had passed, he told Mr. Goodwin that he did not want to talk any longer. Plaintiff was given a depression screener which noted severe depression. Records indicate

that plaintiff reported having thoughts of killing himself, but stated that he would not carry them out. (Tr. 306).

On March 5, 2001, plaintiff reported that everything was "pretty much the same." (Tr. 303). For the first time, plaintiff's counselor noted that plaintiff "expressed being hopeful." He spoke of "positive thinking, utilizing [the] services provided, and being a positive example for his family. Plaintiff indicated that he had been attending church services and praying about his situation. However, he stated that he continued to have nightmares. The counselor encouraged plaintiff to "stay in the dream and face" his fears. (Tr. 303). This same date, Dr. Fraser's notes indicate that plaintiff was continuing to experience hallucinations, although they had reduced in intensity. (Tr. 304).

On June 4, 2001, Dr. D. B. Fraser noted that plaintiff's mood was stable, however, plaintiff continued to experience auditory hallucinations. (Tr. 302). The doctor stated that plaintiff's hallucinations did not seem to bother him as much as they had in the past, and that he seemed "fairly well regulated on his medication." (Tr. 302). However, by October 30, 2001, plaintiff was again experiencing "disturbing" auditory hallucinations that kept him awake at night. (Tr. 354). Records indicate that plaintiff was unable to sleep, despite taking Zyprexa, and continued to be psychotic. Accordingly, Dr. Fraser switched plaintiff's mediation to Seroquel and increased his Prozac because of continued depressive symptoms. (Tr. 354).

Progress notes dated November 20, 2001, reveal that plaintiff had done fairly well on the increased doses of Prozac and Seroquel. (Tr. 354). However, he continued to experience problems

sleeping, sleeping no more than 4 hours a night, and continued to have auditory hallucinations. (Tr. 354).

On December 18, 2001, Dr. Fraser noted that plaintiff remained "markedly depressed" and continued to experience auditory hallucinations. (Tr. 351). As such, he increased plaintiff's Prozac and Seroquel dosages. (Tr. 351).

On February 12, 2002, plaintiff reported continued depressive symptoms and increased psychotic symptoms. (Tr. 351). He indicated that he had been out of Seroquel for several days. Accordingly, Dr. Fraser provided him with samples of both Prozac and Seroquel. (Tr. 351).

On June 11, 2002, plaintiff continued to complain of auditory hallucinations, depressive symptoms, and sleep disturbance despite increased doses of Prozac and Seroquel. (Tr. 351). Accordingly, Dr. Fraser added Remeron Soltab to plaintiff's medication regimen. (Tr. 348).

During a July 27, 2002, therapy session, plaintiff reported continued depression, auditory hallucinations, nightmares, and conflict with his children. (Tr. 349). On September 11, 2002, Dr. Fraser noted that plaintiff's mood had improved and that he was sleeping better. (Tr. 348). However, plaintiff continued to experience auditory hallucinations. (Tr. 348).

On January 14, 2003, plaintiff stated that he had been off his medications for three weeks or more. (Tr. 361). Although he continued to voice complaints concerning auditory and visual hallucinations, his descriptions were "ill defined." Plaintiff requested a disability letter from Dr. Fraser, but Dr. Fraser noted that this had been "held in check due to the uncertainty of diagnosis and degree of disability." As such, plaintiff was given a samples of Seroquel. (Tr. 361).

8

On June 19, 2003, plaintiff underwent psychological testing at the South Arkansas Center for vocational rehabilitation. He was administered the MMPI and TONI (test of non-verbal intelligence) but the results were considered invalid due to the possibility of malingering. (Tr. 358-360). Mr. Goodwin diagnosed plaintiff with malingering; major depressive disorder, recurrent, severe, with psychotic features; alcohol dependence, by history; and, cocaine dependence, by history. However, Mr. Goodwin stated that plaintiff did "appear to have problems with aggression and hostility" and appeared to be "rather manipulative . . ." He also concluded that plaintiff probably did "have some measure of depression due to his corrosive way of interacting with others." (Tr. 360). Further, Mr. Goodwin noted that plaintiff's global assessment of functioning score ("GAF") was only twenty-five. (Tr. 358-59).

On August 27, 2003, plaintiff indicated that he was feeling much worse and hearing voices telling him to harm himself or others. (Tr. 375). He stated that he was depressed over losing his grandmother. In accordance, Dr. Fraser discontinued claimant's Seroquel, doubled his dose of Abilify, and prescribed Remeron. (Tr. 375).

On November 3, 2003, progress notes from Dr. Fraser reveal that plaintiff was continuing to experience auditory hallucinations, paranoia, and difficulty sleeping. (Tr. 374). Plaintiff reported that his medications were ineffective. Dr. Fraser then instructed plaintiff to discontinue the Haldol, Remeron and Cogentin. (Tr. 374).

On January 5, 2004, plaintiff reported that his medication change had no effect on his hallucinations. (Tr. 374). He also indicated that his hallucinations had recently worsened, due to

his lack of medication. Noting that plaintiff was taking fairly high dosages of medication, Dr. Fraser instructed him to continue the same medication regimen and return in three months. (Tr. 374).

On June 1, 2004, plaintiff again reported continued auditory and visual hallucinations. (Tr. 317-373). He also indicated that he had again run out of medication. Further, plaintiff stated that he had been going from relative to relative with no place to stay. Dr. Fraser noted that plaintiff described psychotic symptoms, yet his demeanor and ability to communicate these symptoms caused Dr. Fraser to question his sincerity. (Tr. 371- 73).

While we are cognizant of the fact that Dr. Fraser repeatedly noted the possibility of malingering as a diagnosis, we also note that he prescribed plaintiff fairly high dosages of antidepressant and antipsychotic medications, in spite of his uncertainty. (Tr. 374). Further, progress notes from Dr. Fraser's office indicate that plaintiff continued to experience hallucinations, even with increased dosages of medication. (Tr. 304, 348, 351, 354, 358, 371-375).

We also note that plaintiff's GAF was reportedly twenty-five on two separate occasions. (Tr. 311, 358-359). A GAF of twenty-five reveals that the individual's "[b]ehavior is considerably influenced by delusions or hallucinations," that the individual exhibits a "serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation)," or the individual is unable to "function in almost all areas (e.g., stays in bed all day, no job, home, or friends)." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 34 (Fourth Ed. 2000). Thus, given the conflicting nature of the evidence, we believe that remand is necessary to allow the ALJ to get clarification of Dr. Fraser's diagnoses and to obtain a mental RFC assessment from plaintiff's treating mental health professionals. Accordingly, on remand, the ALJ is directed to address interrogatories to Dr. Fraser and Mr. Goodwin, asking them to review plaintiff's

medical records; to complete an RFC assessment regarding plaintiff's capabilities during the time period in question; and, to give the objective basis for their opinions, so that an informed decision can be made regarding plaintiff's ability to perform basic work activities on a sustained basis during the relevant time period in question. *Chitwood v. Bowen*, 788 F.2d 1376, 1378 n.1 (8th Cir. 1986); *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985).

As there is also evidence to suggest that plaintiff may have been unable to afford all of the medications prescribed, on remand, the ALJ is directed to address this issue. Although it is for the ALJ in the first instance to determine a plaintiff's motivation for failing to follow prescribed treatment or seek medical attention, a failure to seek medical attention or follow a prescribed course of medication or treatment may be excused by a claimant's lack of funds. *Tome v. Schweiker*, 724 F.2d 711, 714 (8th Cir. 1984); *Jackson v. Bowen*, 866 F. 2d 274, 275 (8th Cir. 1989). While it is permissible for an ALJ to consider a claimant's medical treatment and medications when determining the severity of his or her condition, the ALJ must also consider a "claimant's allegation that he [or she] has not sought medical treatment or used medications because of a lack of finances." *Dover v. Bowen*, 784 F.2d 335, 337 (8th Cir. 1986) (citing *Tome*, 724 F.2d at 714). Economic justifications for lack of treatment can be relevant to a disability determination. *Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992).

**Conclusion:**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and, therefore, the denial of benefits to the plaintiff should be reversed and this matter should be remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this the 5th day of September 2006.

                                                        /s/ Beverly Stites Jones
                                                       HON. BEVERLY STITES JONES
                                                       UNITED STATES MAGISTRATE JUDGE